IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

HELENA DIVISION

*******

UNITED STATES OF AMERICA,                          CR 12-20-H-CCL

Plaintiff,

-vs-
                                                   ORDER

WILKERSON P. PHILLIPS, SR.,

Defendant.

*******

Before the Court is Defendant's "Motion to Suppress Evidence Fed. R.

Evid. Rules 12(b)(3)(c) and 47." (ECF NO. 21.)  The United States opposes the

motion, which came on for hearing on July 25, 2013.  Defendant Wilkerson P.

Phillips, Sr. ("Phillips"), was represented by Asst. Fed. Def. Michael Donahoe.

The United States was represented by AUSA Timothy Racicot.  The Court, having

considered the arguments of the parties and the evidence presented at the

voluntariness hearing, is prepared to rule.

<u>Background</u>

Mr. Phillips is charged in a two-count Indictment with "Theft from a Health Care Program," in violation of 18 U.S.C. § 669, and "Acquiring Controlled Substances by Misrepresentation, Fraud, and Deception," in violation of 21 U.S.C. § 843(a)(3). He is a Certified Nurse Anaesthetist who was working as a full-time contract employee at the VA Medical Center (the "medical center" or the "hospital") at Fort Harrison, Helena, Montana, in July 2011. He had previously worked for the VA in New Orleans, Louisiana, for 15 years prior to coming to Montana to work at Fort Harrison. Phillips came under the scrutiny of the Veterans Administration Office of Inspector General (VA-OIG) during an investigation of possible drug diversion from the VA Medical Center. When interviewed by two agents of the VA-OIG, he confessed to diverting drugs from the Medical Center for his own use, he signed three consent forms allowing search of his person and a bag, his car, and his hotel room. Vials of drugs taken from the Medical Center were found in his bag, in his car, and in his hotel room.

Mr. Phillips now argues that when he was interviewed by two agents of the VA-OIG he was actually under arrest, and because he was not *Mirandized* before he admitted having diverted controlled substances from the VA hospital, his

confession should be suppressed.  In addition to that *Miranda* argument, Phillips also argues that a *Garrity*[1] warning form that was provided by the agents confused him because it did not tell him that he had the right to counsel and the *Garrity* warning form also confused him by requiring him to speak to the agents unless what he had to say incriminated him.

FINDINGS OF FACT:

1.  Agent Munn testified; he is approximately the same size (height and weight) as Mr. Phillips, although he appears to be significantly younger (by 10-20 years) than Mr. Phillips.  Agents Gilbert and Munn were casually dressed in khaki pants and blue jeans when they approached Phillips in or near the parking lot of the VA Medical Center after his shift on July 15, 2011, in the mid- to late-afternoon.  Phillips never saw the agents' firearms.

2.  Agents Gilbert and Munn told Phillips who they were (from the VA-OIG) and that they wanted to speak with him about the anesthesia department, mentioning an issue with narcotics.  They asked him if he would be willing to come back into the hospital to talk to them.  Phillips said that he would talk to

---

[1]    *Garrity v. New Jersey*, 385 U.S. 493 (1967) (holding that police officers' confessions given under threat of firing were coerced and inadmissible).

them, and Agent Gilbert led the way back into the hospital with Phillips and Agent Munn following abreast behind him.

3.  As a long-time employee of the VA, Phillips was familiar with the VA Office of Inspector, and he knew that the OIG conducted internal investigations within the agency.

4.  Mr. Phillips' body language did not convey surprise when the agents approached him near the parking lot, and it even seemed to Agent Munn that Phillips was communicating that he knew why the agents were there.

5.  Agents Gilbert and Munn walked with Phillips to the third floor administrative office area, where they entered a conference room with an oval table.  Agents Gilbert and Munn sat across from each other toward the far end of the table, and Phillips sat at the head of the table between them.  There were two doors to the conference room, both of which were closed but unlocked, and each door had a 10 by 10 inch window so that passers-by in the hallway could see Phillips and the agents at the conference table.  The nearest door was to Phillips' immediate right, Phillips could see both conference room doors, and neither agent was seated between Phillips and the nearest door.

6.  Agent Munn engaged in two or three minutes of general chat with

Phillips about his work history with the VA and where he went to school, and then Agent Munn advised Phillips of his *Garrity* rights.

7.  Agent Munn gave Phillips a *Garrity* form, called an "Advisement of Rights (Federal Employees-Garrity)."  Agent Munn filled in a blank with the words 'drug diversion' to complete the sentence, "This inquiry concerns 'drug diversion'."  Phillips read the form to himself.  It informed him that

-- "You have the right to remain silent if your answers may tend to incriminate you."[2]

-- "If you do decide to answer questions or make a statement, you may stop answering at any time."

-- "Anything you say may be used as evidence both in an administrative proceeding or any future criminal proceeding involving you."

-- "If you refuse to answer the questions posed to you on the grounds that the answers may tend to incriminate you, you cannot be removed (fired) for

_____

[2]    Defense counsel argues that this statement is inappropriate because it requires the employee to decide whether or not his answer is incriminatory before he can refuse to give it.  This is an unduly narrow reading of the admonishment because it entirely ignores the subjunctive mood of "may" and the meaning of the verb "to tend."  A closer reading of this sentence is that the employee can refuse to answer questions if he thinks there is any possibility of self-incrimination.  In addition, the next sentence states that the employee can stop talking at any time.  Although, potentially unfavorable inferences could be drawn from an employee's silence, such a threat (of mere inference, not firing) has been found "too conditional" to entitle an employee to immunity for use of statements in a criminal prosecution.  *United States v. Stein*, 233 F.3d 6, 14 (1st Cir. 2000).

remaining silent."

(ECF No. 21-1, Exhibit A "Advisement of Rights (*Garrity*).)

8.  Phillips signed the acknowledgment paragraph of the Advisement of Rights, which paragraph stated that "I understand the warnings and assurances stated above and I am willing to make a statement and answer questions voluntarily.  No promises or threats have been made to me and no pressure or coercion of any kind has been used against me."  (ECF No. 21-1, Exhibit A "Advisement of Rights (*Garrity*).)

9.  Phillips did not hesitate to sign the *Garrity* form.

10.  Phillips was properly informed that if he chose not to speak to the agents, he could not be terminated (fired) for so choosing.[3]

11.  After Phillips signed the *Garrity* form, Agent Munn asked Phillips a second time whether he would be willing to speak with them.  For the second time, Phillips answered that he was willing to speak with them.

12.  Agent Munn next asked whether Phillips would consent to a search of

---

[3]    Defendant also produced Karl Englund, a Missoula attorney, who testified without objection that the *Garrity* form was confusing and inadequate. The Court considered this testimony for whatever it is worth, but it did not alter the Court's opinion.

his bag and his coat.  Phillips said that he would consent.

13.  Agent Munn gave Phillips a form entitled "Voluntary Consent to Search."  (ECF No. 21-1 at 2, Exhibit B "Voluntary Consent to Search.")  Agent Munn filled in certain blanks on the form.  First, Agent Munn wrote that the offense being investigated was "drug diversion."  Second, Agent Munn also wrote that the search being requested was a search of "my Persons/black bag," physically located at "VAMC Ft. Harrison."

14.  The Consent to Search form concludes with a statement that

I have been informed of my Constitutional right to refuse to permit this search in the absence of a search warrant and that I have the right to require that a search warrant be obtained prior to the search and to stop the search at any time.  In full understanding of this right, I have decided to allow this search to be made.

This authorization is given freely and voluntarily without duress and with no threats having been made and/or promises offered to me.

(ECF No. 21-1 at 2, Exhibit B, Voluntary Consent to Search.)

15.  Phillips read the Voluntary Consent to Search form (search of person/black bag) and signed it.  The time of the search was noted to be 16:05.

16.  Phillips did not hesitate to sign the consent to search his bag and person.

17.  Agent Munn found vials of Fentanyl inside Phillips' black bag. Without any need for discussion, it was patently obvious to all present that the vials of Fentanyl were evidence of drug diversion.

18.  Agent Munn asked Phillips whether he knew this day was coming. Phillips responded, 'Yes.'

19.  Agent Munn and Phillips then discussed Phillips' diversion of drugs from the anesthesia department and the hospital.  Phillips' admissions began within a few minutes (approximately fifteen minutes or less) from the beginning of the interview.

20.  Agent Munn told Phillips that they had been looking at the medical center's drug dispensing  transaction log (the "Omnicell log").[4]  Most of the rest of the 45 minute interview consisted of Agent Munn going over the Omnicell log with Phillips.  As to some of the transactions in the log, Phillips acknowledged having diverted narcotics.

21.  <u>Totality of Circumstances - Confession.</u>  Phillips is a middle-aged man. He is an intelligent and educated medical professional.  He was advised of his

_____

[4]    The Omnicell machine dispenses narcotics to staff and records each dispensing transaction.

right to refuse to answer questions.  The length of the  interaction prior to
confession (including filling out paperwork) was less than 15 minutes.  Phillips
blurted out a confession with little to no questioning or prompting.  No
punishment or other coercion was utilized to obtain the confession.

22.  Although Agent Munn's question ('Is this the day that you knew was
coming?')was perhaps arguably a question that was reasonably likely to elicit a
self-incriminating statement, it was not a psychologically coercive question.
Instead this question was but a simple invitation for Phillips to acknowledge the
significance of the vials of narcotics in his black bag.  After answering, "Yes,"
Phillips then began to discuss the details of how he had been diverting controlled
substances from the hospital, almost as if a formal confession was simply
unnecessary or would be redundant in light of the circumstance of having been
caught with the hospital's controlled substances in his bag.

23.  After completing this review of the Omnicell log, Agent Munn asked
Phillips whether he would consent to a search of his car and of his hotel room.
Phillips agreed to these searches.

24.  Agent Munn gave Phillips two "Voluntary Consent to Search" forms,
one for his car and one for his hotel room.  These forms were identical to the first

Voluntary Consent to search form described above at ¶¶ 9-10.  Phillips read the

forms.  Phillips signed each form.  (ECF No. 21-1 at 3-4 (Exhibits C-D),

"Voluntary Consent to Search".)

25.  Phillips did not hesitate to sign these consent to search forms.

26.  Agent Munn's impression of Phillips' emotional state toward the

conclusion of the interview was that Phillips was more optimistic at the end of the

interview than at the beginning, because he had been anticipating this interview

for some time and perhaps he was relieved that it was over.  Agent Munn testified

that Phillips's demeanor was perfectly normal.

27.  Toward the end of the meeting and just before they left the conference

room, Phillips asked the agents whether he was going to be arrested.  Indeed,

Phillips himself testified that "I asked if I was going to be arrested."  The agents

assured him that he would not be arrested, although they did plan to refer the case

to U.S. Attorney's Office.

28.  <u>Totality of Circumstances - Custody.</u>  Agents Munn and Gilbert asked

Phillips whether he would be willing to talk to them, so the language used was

invitational, not commanding.  At the beginning of the meeting, Mr. Phillips was

informed that he did not have to speak to the agents and that he could stop

speaking to them at any time. Mr. Phillips was also informed that he could not be fired from his job for refusing to speak to the agents. Agents Munn and Gilbert did not confront Mr. Phillips with evidence of guilt. To the contrary, Mr. Phillips confronted the agents with evidence of guilt when he consented to a search, apparently knowing that hospital vials of narcotics were to be found within his black bag. The physical surroundings of the meeting was a hospital conference room that was open to public view by virtue of the windows on the two doors. The meeting was brief, however, and Mr. Phillips confessed immediately after seeing the narcotics in his bag. No pressure whatsoever was applied to detain Mr. Phillips. When the three men drove to Mr. Phillips' hotel for a consent search there, Mr. Phillips drove himself in his own car to his hotel room, and Agents Munn and Gilbert followed in their own car.

29. The agents and Mr. Phillips left the medical center and walked to his car in the parking lot. Mr. Phillips told the agents what they would find in the car and where they would find it. The agents found the evidence where Mr. Phillips told them they would find it.

30. After the search of the car, Mr. Phillips drove his car to his hotel, and the agents followed him in their car.

31.  There was nothing inherently coercive in the agents driving their vehicle behind Mr. Phillips' vehicle to his hotel room.  As a practical matter, it was the best way for the agents to find the hotel, and if anything this transportation arrangement underscored the fact that the agents had no intention of arresting or detaining Mr. Phillips.

32.  As before with his car, Mr. Phillips again told the agents where they would find evidence in his hotel room.  After finding empty vials, foil wrappers for vials, used needles, and bloody cotton swabs in the hotel room in the locations indicated, the agents gathered the evidence.

33.  Before leaving the hotel room, Agent Munn asked Phillips to let him know if he returned to Louisiana or moved anywhere else in case the U.S. Attorney's Office wanted to contact him or if the agents needed to talk to him again.

34.  Approximately one hour later, the agents returned to the hotel room to give Phillips a receipt for all the evidence they had collected.  When there was no response to their knock on the hotel room door, the agents slid the receipt under the door and left.  They did not have further contact with Phillips.

35.  Within one week, Phillips returned to his home state of Louisiana.

36.  Approximately one month later, two different agents from VA-OIG visited Phillips at his home in Harvey, Louisiana, to inquire whether there might be other employees at the VA Medical Center that were involved in the drug diversion with Phillips.

37.  The VA-OIG agents *Mirandized* Phillips on July 8, 2011, and then asked him questions about other employees involved with drug diversion.  After being *Mirandized*, Phillips acknowledged his drug diversion activity but assured the agents that only he was involved and that he had no relevant information regarding any other employee.

38.  The Court found that Phillips was a credible witness generally, on all but a few crucial points:

    a.  Phillips contradicted himself as to whether or not he believed himself to be under arrest at the time of the questioning, testifying in a somewhat garbled fashion that he thought he was under arrest.  However, Phillips twice indicated in his testimony quite clearly that he merely asked Agent Munn whether he was *going to be* arrested.  The Court finds that Phillips knew he was free to go at all times  during his meeting with Agents Munn and Gilbert.

    b.  The Court found Phillips to be credible when he testified that he felt compelled to cooperate with the agents.  However, it is clear that nothing the agents said or did made Phillips feel compelled to cooperate with them.  Instead, Phillips elliptical answer as to why he felt that way-- "Agents.  You know.  OIG."--indicates to the Court that Phillips wanted to

protect his long-term employment of over 15 years with the VA.[5]  The Court
infers from all of his testimony that Phillips felt internally (not externally)
motivated to cooperate voluntarily with VA-OIG agents to protect his
employment relationship with the VA.[6]  The Court finds that Phillips
cooperated with Agents Munn and Gilbert entirely for legitimate, personal
reasons and not because his will was overborne.

c.  The Court finds that Phillips contradicted his prior statement that
he did not know who the two agents were and did not remember seeing any
identification or badges.  (*See* ECF No. 20, "Decl. Investigator J. Gaffney,
¶¶ 6-7.)  In his testimony, Phillips stated that he knew the men were from
VA-OIG, and he knew what organizational role OIG played within the VA.
Phillips' testimony is consistent in this regard with Agent Munn's testimony
that the agents showed Phillips their credentials.

d.  The Court finds that Phillips' testimony  that he was startled and
confused by the appearance of two agents from VA-OIG is not credible
because it is overly exaggerated.  With Phillips' age and education, long
history of work experience with the VA, and prior assumption that this day
was coming, at most Phillips would have been mildly surprised to be
addressed by two strangers on the way to his car (as any person would be)
but then quickly recovered as he grasped that this was a legitimate
workplace interaction.  This finding is consistent with Agent Munn's

---

[5]  This employment relationship brings with it its own set of circumstances
and obligations.  The Department of Veterans Affairs' "Standards of Ethical
Conduct and Related Responsibilities of Employees" *requires* VA employees to
furnish information regarding employment matters, although an employee "will
not be required to give testimony against himself or herself *in any matter in which
there is indication that he or she may be or is involved in a violation of law
wherein there is a possibility of self-incrimination*."  38 C.F.R. § 0.735-12(b).

[6]  This only underscores the need for a *Garrity* admonishment to inform
the employee that refusing to cooperate with a workplace internal investigation
will not result in termination of employment.

testimony that Phillips did not seem surprised and, in fact, seemed to be acknowledging that he knew why the agents were addressing him.


CONCLUSIONS OF LAW:

<u>Arrest and Custodial Interrogation</u>

1. As a procedural safeguard to protect this Fifth Amendment protection, *Miranda* warnings must be given prior to custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 444-45, 86 S.Ct. 1602, 1612 (1966). These warnings require the individual to be informed "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. .. ." *Miranda*, 440 U.S. at 479, 86 S.Ct. at 1630.

2. Custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444. The objective test is whether a reasonable person in the defendant's position would not feel free to

terminate the interrogation and leave.  *United States v. Craighead*, 539 F.3d 1073, 1082 (9th Cir. 2008).

3.  In the custodial context, interrogation means "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."  *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689-90 (1980).

4.  An individual is in custody when he is formally arrested or when his freedom of action is deprived to "a degree associated with formal arrest."  *United States v. Rodriguez-Preciado*, 399 F.3d 1118, 1127 (9th Cir. 2005).

5.  A court determines custody status by considering the totality of the circumstances of the questioning, *see United States v. Kim*, 292 F.3d 969, 973 (9th Cir. 2002).

6.  In considering the totality of the circumstances of the questioning, the main factors are "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual."  *Kim*, 292 F.3d at 974 (citing

*United States v. Hayden*, 260 F.3d 1062, 1066 (9th Cir. 2001)).

7.   Under the totality of the circumstances (*see* Findings ¶ 28), all the main factors favor a conclusion that Phillips was not in custody, and a reasonable person in his position would have understood that he was speaking to the agents voluntarily and that he was free to stop talking to the agents and leave at any time.

Consent to Search

8.   Consent is a recognized exception to the Fourth Amendment protection against unreasonable searches and seizures.  *Katz v. United States*, 389 U.S. 347, 358 n.22, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

9.   The United States carries the burden of showing that consent to search is free and voluntary.  *Schneckloth v. Bustamonte*. 412 U.S. 218, 222, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

10.   Whether consent is free and voluntary rests on the following factors: "(1) whether defendant was in custody; (2) whether the arresting officers have their guns drawn; (3) whether *Miranda* warnings have been given; (4) whether the defendant was told he has a right not to consent; and (5) whether defendant was told a search warrant could be obtained.  The fact that some of these factors are not established does not automatically mean that consent was not voluntary."

*United States v. Morning*, 64 F.3d 531, 533 (9th Cir. 1995) (quoting *United States v. Castillo*, 866 F.2d 1071, 1082 (9th Cir. 1988)).

11.  *Miranda* warnings need not be given prior to requesting consent for search.  *United States v. Vongxay*, 594 F.3d 1111, 1120 (9th Cir. 2010) (quoting *United States v. Ritter*, 752 F.2d 435, 438 (9th Cir. 1985)).

12.  Phillips' three consents to search were voluntary because he was not in custody, the officers' firearms were not visible to him, he was informed that he had the right not to give consent, and he was not told that a search warrant could be obtained.

Voluntariness of Confession

13.  The Fifth Amendment to the United States Constitution provides individuals with a privilege against compulsory self-incrimination.

14.  Confessions must be made voluntarily to be admissible.  *See Lego v. Twomey*, 404 U.S. 477, 483-85, 92 L.Ed.2d 618 (1972).  Either physical intimidation or psychological pressure may precipitate an involuntary confession. *United States v. Tingle*, 658 F.2d 1332, 1335 (9th Cir. 1981).  In either case, the test is whether the will of the individual has been overborne.  *Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).  In

applying this test, the court looks to the totality of the circumstances, often considering the youth of the accused, his intelligence, the lack of any advice of constitutional rights, the length of detention, the repetitive and prolonged nature of questioning, and the use of physical punishments like deprivations of food or sleep. *Id.* at 226, 93 S.Ct. 2041. The government bears the burden of proving by a preponderance of the evidence that a defendant's statements were voluntary. *See Lego*, 404 U.S. at 489; *Tingle*, 658 F.2d at 1335.

15. When determining admissibility of confessions, consideration should be given to

> "all the circumstances surrounding the giving of the confession, including (1) the time elapsing between arrest and arraignment of the defendant making the confession, if it was made after arrest and before arraignment, (2) whether such defendant knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession, (3) whether or not such defendant was advised or knew that he was not required to make any statement and that any such statement could be used against him, (4) whether or not such defendant had been advised prior to questioning of his right to the assistance of counsel; and (5) whether or not such defendant was without the assistance of counsel when questioned and when giving such confession.
>   The presence or absence of any of the above-mentioned factors to be taken into consideration by the judge need not be conclusive on the issue of voluntariness of the confession."

18 U.S.C. § 3501(b).

15.  Under the totality of the circumstances (*see* Findings ¶ 21), the Court concludes that Phillips' June 15, 2011, confession was voluntary because his will was not overborne by that of the agents and his confession was not precipitated by physical or psychological coercion.  Phillips was informed of the nature of the offense for which he was under suspicion, and Phillips knew that he was not required to make any statement and that any statement he did make could be used against him.

16.  The Court further concludes that Phillips' July 8, 2011, confession was also voluntary and sufficiently distant in time from the events of June 15, 2011, as to be an entirely separate confession.

## CONCLUSION

The Court having concluded that Mr. Phillips was not arrested or otherwise in custody when he was interviewed by VA-OIG agents on June 15, 2011, that he was not entitled to the *Miranda* warnings, that the *Garrity* admonition was properly given to him and was not confusing to him, and that his consent to search and confession were freely and voluntarily given by him, the Court deems the motion to suppress statements and evidence to be without merit.

Accordingly,

IT IS HEREBY ORDERED that Defendant's Motion to Suppress (ECF No. 21) is DENIED.

DONE and DATED this 1st day of July, 2013.

CHARLES C. LOVELL
SENIOR UNITED STATES DISTRICT JUDGE